UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

DAVID MCLEOD,                        )
                                     )
                Plaintiff,           )
                                     )
        v.                           )     No. 1:04CV124 FRB
                                     )
JO ANNE B. BARNHART,                 )
Commissioner of Social Security,     )
                                     )
                Defendant.           )


**MEMORANDUM AND ORDER**

    This cause is on appeal for review of an adverse determination by the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural Background

    On July 25, 2002, plaintiff David McLeod filed an application for Disability Insurance Benefits (DIB) pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq., and an application for Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et seq., in which he claimed he became disabled on July 20, 2000. (Tr. 80-82, 40-44.)  On initial consideration, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 30, 45, 68-73.)  On November 13, 2003, a hearing was held before an Administrative Law Judge (ALJ). Plaintiff testified and was

represented by counsel.  Plaintiff's spouse also testified at the hearing.  (Tr. 354-74.)  On May 14, 2004, the ALJ issued a decision denying plaintiff's claims for benefits.  (Tr. 10-17.)  After considering additional evidence, on July 16, 2004, the Appeals Council denied plaintiff's request to review the ALJ's decision.  (Tr. 3-6.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Testimony of Plaintiff</u>

At the hearing on November 13, 2003, plaintiff testified in response to questions posed by counsel and the ALJ.  Plaintiff is forty-one years of age.  (Tr. 357.)  He stands five feet, ten inches tall and weighs 250 pounds.  (Tr. 359.)  Plaintiff completed the tenth grade in high school and received no additional schooling or specialized training.  (Tr. 358.)  Plaintiff lives with his wife and fifteen-year-old daughter.  (Tr. 359.)  Plaintiff testified that his wife is not employed and is under a doctor's care for epileptic seizures.  (Tr. 368.)  Plaintiff testified that his family receives assistance with food stamps and from Family Services.  (Tr. 371.)

From 1987 to 1991, plaintiff worked as a repairman and tractor operator in a land grading business.  (Tr. 197.)  From April to October 1991, plaintiff worked as a farm worker and tractor operator.  From September 1993 to November 1995, plaintiff worked as a dye worker at Missouri Forge.  (Tr. 197, 366.)  From

1996 to 2000, plaintiff worked as a set-up man in a picture framing business. (Tr. 197.) Plaintiff testified that he had problems performing his last job because of his feet, hot flashes and burning out. (Tr. 358.) Plaintiff testified that he was terminated from his last job for unknown reasons and collected unemployment compensation thereafter for approximately six months. (Tr. 368.)

Plaintiff testified that he has suffered from heart problems for one and one-half years and that he experiences chest pain, tiredness and weakness as a result. (Tr. 359-60.) Plaintiff testified that nervousness and exertion precipitate his chest pain. Plaintiff testified that he experiences hot flashes two or three times a day and that such sensation has sometimes traveled down his left arm. (Tr. 360.)

Plaintiff testified that he also suffers from high blood pressure for which he takes multiple medications. (Tr. 360-61.) Plaintiff testified that he continues to have high blood pressure despite such treatment. (Tr. 361.) Plaintiff testified that this condition causes him to experience dizziness, hot flashes, weakness, and constant blurriness. Plaintiff testified that he also suffers from headaches which last from thirty minutes to an hour, for which he usually lies down. (Tr. 362.)

Plaintiff testified that he was diagnosed with diabetes in 1991 and has two insulin injections each day for the condition. Plaintiff testified that he is also on a diabetic diet. (Tr. 363,

370.)  Plaintiff testified that he experiences tiredness, hot flashes and excessive urination on account of the condition, as well as related conditions with his feet, including cracking, swelling and burning sensations.  (Tr. 363.)  Plaintiff testified that his doctor has recommended exercise and that he tries to engage in such exercise, but that he usually just walks around the house.  (Tr. 370-71.)

Plaintiff testified that he was currently experiencing kidney problems which caused him to experience back pain and burning sensations upon urination.  (Tr. 364.)

Plaintiff testified that he also suffers from sleep apnea for which he uses a CPAP (constant pulmonary air pressure) machine which provides him some relief.  Plaintiff testified that he nevertheless continues to feel tired.  (Tr. 364.)  Plaintiff testified that sinus problems cause him to continue to have difficulty sleeping even with the CPAP machine.  (Tr. 365.)  Plaintiff testified that he has fallen asleep while driving.  Plaintiff testified that he had also fallen asleep during his employment, but that such episodes occurred prior to his use of the CPAP machine.  (Tr. 364.)

As to his daily activities, plaintiff testified that he sits around the house and tries to relax.  Plaintiff testified that he tries to help his spouse but is limited in his ability to do so.  Plaintiff testified that he can wash dishes "[f]or a little bit," but that after about thirty minutes he gets hot flashes, "blurs

- 4 -

out" and his feet begin to hurt. Plaintiff testified that he then must sit after which the sensations pass in an hour or two. (Tr. 367.) Plaintiff testified that he sometimes accompanies his wife grocery shopping. (Tr. 369-70.) Plaintiff testified that he drives maybe once a day "to town and back." (Tr. 370.) Plaintiff testified that he smokes one and one-half packs of cigarettes a day. (Tr. 371.)

Plaintiff testified that he cannot presently be employed because he "blur[s] out," gets hot flashes, is tired all of the time, falls asleep while driving, and "stay[s] sick a lot." (Tr. 366.)

B. **Testimony of Plaintiff's Spouse**

Janice Sue McLeod, plaintiff's spouse, testified at the hearing in response to questions posed by the ALJ and counsel. Mrs. McLeod testified as to plaintiff's daily activities and specifically, that plaintiff awakens and gets up before she does, fixes breakfast and then sits. Mrs. McLeod testified that when plaintiff starts moving around, sweat pours from him and she instructs him to sit because she knows his blood pressure is raised. (Tr. 372.) Mrs. McLeod testified that she and plaintiff basically just sit around and keep an eye on each other given their respective medical conditions. Mrs. McLeod testified that they sometimes visit his mother and her sister, and that they do not attend any church or school activities. Mrs. McLeod testified that plaintiff could not be employed because of his inability to stand

- 5 -

and because of his inability to stay awake while sitting.  (Tr. 373.)  Mrs. McLeod also testified that plaintiff's hot flashes, headaches and high blood pressure would affect his ability to work. (Tr. 373-74.)

### III.  Medical Records[1]

In February 1996, Dr. George Samuel noted plaintiff's diabetes mellitus-II to be uncontrolled and that plaintiff was a candidate for insulin.  (Tr. 224.)

Plaintiff visited Dr. T. David Chung on December 22, 1997, who diagnosed plaintiff with hypertension and diabetes.  It was noted that plaintiff's medications included insulin, Atenolol and Captopril.[2]  Plaintiff was instructed to continue on his same medications and was prescribed Norvasc in addition.[3]  (Tr. 246.)

On January 19, 1998, Dr. Chung noted plaintiff to be experiencing family problems in that his wife was considering divorce.  Plaintiff reported he could not sleep.  Dr. Chung diagnosed plaintiff with hypertension, anxiety and depression.

---

[1]Records were submitted to and considered by the Appeals Council subsequent to the ALJ's adverse decision.  (Tr. 339-53.) The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence.  Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).  For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

[2]Atenolol and Captopril are indicated for the treatment of hypertension.  Physicians' Desk Reference 647, 2118 (55th ed. 2001).

[3]Norvasc is indicated for the treatment of hypertension. Physicians' Desk Reference 2506 (55th ed. 2001).

Plaintiff was instructed to continue on his same medications and BuSpar[4] was prescribed. (Tr. 245.)

On February 16, 1998, plaintiff reported to Dr. Chung that he felt okay and that Buspar helped him a lot. Dr. Chung diagnosed plaintiff with poorly controlled hypertension and changed plaintiff's medication to Cardura.[5] (Tr. 245.)

Plaintiff returned to Dr. Chung on March 13, 1998, for follow up of his hypertension. Dr. Chung noted plaintiff to have a cold and sinus trouble. Dr. Chung continued in his diagnosis of poorly controlled hypertension and instructed plaintiff to increase his dosage of Cardura. Plaintiff was also prescribed medication for sinusitis and bronchitis. On March 27, 1998, Dr. Chung instructed plaintiff to continue on his same medications. (Tr. 244.)

In April and May 1998, Dr. Chung continued to treat plaintiff for hypertension and otitis media, with adjustments made to plaintiff's medications. (Tr. 243.)

On July 31, 1998, plaintiff reported to Dr. Chung that he felt better. Dr. Chung noted plaintiff's hypertension to be poorly controlled and instructed plaintiff to remain on his same medications. On August 31, 1998, plaintiff reported to Dr. Chung

---

[4]BuSpar is used in the treatment of anxiety disorders to relieve the symptoms of anxiety. Medline Plus (revised Mar. 17, 1998)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202100.html>.

[5]Cardura is indicated for the treatment of hypertension. Physicians' Desk Reference 2474 (55th ed. 2001).

that he felt good and had no problems with his medications. Plaintiff was instructed to continue on his medications and was prescribed various inhalers. (Tr. 242.)

On November 2, 1998, plaintiff reported to Dr. Chung that he was doing fine. Dr. Chung continued in his diagnosis of hypertension and further diagnosed plaintiff with emphysema. Plaintiff was instructed to continue with his Cardura. (Tr. 241.)

On January 29, 1999, plaintiff reported to Dr. Chung that he felt okay and that he was suffering from a recent chest cold. Plaintiff reported fluctuations in his blood pressure readings. Dr. Chung continued in his diagnoses of hypertension and diabetes, and also diagnosed plaintiff with bronchitis. (Tr. 240.)

On May 25, 1999, plaintiff reported to Dr. Chung that he felt good and that his blood pressure was okay, although it ran high. (Tr. 240.) Dr. Chung noted plaintiff's condition of hypertension to be fair and his blood pressure to be poorly controlled. Lotrel[6] was prescribed. On June 22, 1999, plaintiff reported to Dr. Chung that he felt good. Dr. Chung noted plaintiff's blood pressure to have decreased and be doing better. Dr. Chung diagnosed plaintiff with hypertension, diabetes and anxiety. Plaintiff was instructed to continue on his same medications. (Tr. 239.)

On September 20, 1999, plaintiff reported to Dr. Chung

---

[6]Lotrel is indicated for the treatment of hypertension. Physicians' Desk Reference 2189-90 (55th ed. 2001).

that he was stressed and had been fighting with his wife. Plaintiff complained that BuSpar gave him hot flashes. Dr. Chung diagnosed plaintiff with hypertension, type-II diabetes and reactive anxiety. Plaintiff was instructed to continue with his medications and Alprazolam[7] was prescribed. (Tr. 239.)

In October 1999 and in January and March 2000 plaintiff reported to Dr. Chung that he felt good and was doing fine. Dr. Chung continued in his diagnoses and instructed plaintiff to continue on his same medications. (Tr. 237-38.)

On June 13, 2000, plaintiff reported to Dr. Chung that he felt stressed out at work and was experiencing chest pain often. Upon physical examination, Dr. Chung diagnosed plaintiff with angina, hypertension, hyperlipidemia, diabetes, and reactive anxiety. Plaintiff was instructed to continue with his medications and a stress test was ordered. (Tr. 236.) On September 8, 2000, plaintiff reported that he felt better. Dr. Chung continued in his same diagnoses and instructed plaintiff to continue on his same medications. (Tr. 235.)

On February 20, 2001, plaintiff reported to Dr. Chung that he felt okay. Upon physical examination, Dr. Chung diagnosed plaintiff with hypertension, bronchitis and diabetes. Plaintiff was instructed to continue with his same medications. (Tr. 234.)

On April 12, 2001, plaintiff complained to Dr. Chung of

---

[7]Alprazolam (Xanax) is indicated for the management of anxiety disorder or the short-term relief of symptoms of anxiety. Physicians' Desk Reference 2650 (55th ed. 2001).

pain, swelling and tenderness about his left collarbone.  Plaintiff also reported tenderness about the anterior tibial area.  Plaintiff reported that someone had recently kicked him.  Dr. Chung ordered x-rays of the affected areas to rule out possible fractures.  (Tr. 233-34.)  Otherwise, Dr. Chung continued in his diagnoses of hypertension, diabetes and reactive anxiety.  (Tr. 233.)

On June 13, 2001, Dr. Chung noted that plaintiff had stopped taking Cardura after hearing that such medication can cause heart failure.  Plaintiff reported being under a lot of stress. Physical examination showed some swelling of the calves.  Dr. Chung diagnosed plaintiff with poorly controlled hypertension and instructed plaintiff to be sure to take his Cardura.  Dr. Chung also continued in his diagnoses of diabetes and reactive anxiety. (Tr. 233.)

Plaintiff visited the Ripley County Family Clinic on September 27, 2001, for a check up and prescription refills.  HCTZ[8] was added to plaintiff's medication regimen for hypertension.  On October 24, 2001, plaintiff failed to appear for a scheduled appointment at the Clinic.  (Tr. 283.)

On December 3, 2001, plaintiff reported to Dr. Chung that he felt good.  Dr. Chung noted plaintiff's blood pressure to have increased and his hypertension to be poorly controlled.  No swelling was noted about the extremities.  Limited motion was noted

---

[8]HCTZ (Hydrochlorothiazide) is indicated for the treatment of hypertension.  <u>Physicians' Desk Reference</u> 2417-18 (55th ed. 2001).

about the shoulder and knee joints. Dr. Chung continued in his diagnoses and further noted plaintiff to have arthritis of multiple joints. Plaintiff was continued on his same medications. (Tr. 232.)

On January 21, 2002, Dr. Chung noted plaintiff's blood pressure to be 204/110. Plaintiff reported no dizziness and no headaches. (Tr. 232.) Dr. Chung diagnosed plaintiff with poorly controlled hypertension and diabetes and instructed plaintiff to continue with his medications. Additional medication was prescribed. On February 4, 2002, plaintiff reported to Dr. Chung that he felt good and had no headaches. Plaintiff's blood pressure was noted to be 142/90. (Tr. 230.)

On April 1, 2002, plaintiff reported to Dr. Chung that he did not feel well and that he had swelling of the ankles. Dr. Chung noted there to be edema about the ankles with discoloration about the calves. Chest x-rays were ordered. (Tr. 230.)

On May 7, 2002, plaintiff complained to Dr. Chung of being tired and that he could not sleep. No swelling was noted about the extremities and plaintiff had no limited motion about the joints. Dr. Chung diagnosed plaintiff with poorly controlled hypertension, diabetes and marked reactive anxiety. Plaintiff was instructed to continue on his same medications and Xanax was prescribed. (Tr. 229.)

On June 5, 2002, plaintiff returned to Dr. Chung who noted plaintiff to be exhibiting symptoms consistent with early

heat stroke.  It was noted that plaintiff was exposed to the heat while working.  Dr. Chung diagnosed plaintiff with hypertension, diabetes and anxiety, and instructed plaintiff to continue with his medications and to stay out of the heat as much as possible.  (Tr. 229.)

Plaintiff was admitted to the emergency room at Ripley County Memorial Hospital on July 17, 2002, complaining of chest pain, hot flashes and swelling in his legs.  (Tr. 276-79.) Plaintiff reported the chest pain to be radiating down his left arm with occasional radiation to his neck.  (Tr. 278.)  Plaintiff reported the pain to be at a level seven on a scale from one to ten.  (Tr. 276.)  Plaintiff's current medications were noted to include Lotrel, Cozaar,[9] Lasix,[10] Doxazosin (Cardura), insulin, and potassium chloride.  (Tr. 278.)  A chest x-ray showed no acute cardiopulmonary change.  Plaintiff's heart size was normal and there was no consolidative infiltrate or effusion.  (Tr. 289.) During his admission to the hospital, plaintiff was given Xanax, Clonidine,[11] K-Tab (potassium chloride), and Prilosec in addition to his other medications.  Dr. M. Palani determined plaintiff to be having possible sleep apnea in conjunction with his other medical

_____

[9]Cozaar is indicated for the treatment of hypertension. Physicians' Desk Reference 1902-03 (55th ed. 2001).

[10]Lasix is a diuretic given to help reduce the amount of water in the body.  Medline Plus (revised Aug. 8, 2000) <http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202205.html>.

[11]Clonidine is indicated in the treatment of hypertension. Physicians' Desk Reference 968-67 (55th ed. 2001).

problems and it was determined that plaintiff would be transferred to Barnes-Jewish Hospital for further evaluation. Upon discharge to Barnes-Jewish, plaintiff was diagnosed with uncontrolled hypertension, chronic obstructive pulmonary disease (COPD), bronchitis, possible sleep apnea, and coronary artery disease. (Tr. 279.)

Plaintiff was admitted to Barnes-Jewish Hospital on July 19, 2002, upon transfer from Ripley County with complaints of increased chest pain. Plaintiff reported having experienced intermittent chest pain with associated aching of the left arm during the previous year. Plaintiff reported that he ran out of his medications five days prior which resulted in increased blood pressure. Plaintiff's medications were noted to include Lotrel, Cozaar, Lasix, Keflex (an antibiotic), Prilosec, and Xanax. (Tr. 248.) Plaintiff was admitted for cardiac evaluation. (Tr. 249.) An echocardiogram showed no wall motion abnormalities or myocardial ischemia. A Duke treadmill score showed plaintiff to be at low risk. (Tr. 253.)

Plaintiff visited the Ripley County Family Clinic on July 24, 2002, for follow up of his recent hospitalization. A sleep study was ordered for plaintiff's sleep apnea condition. (Tr. 283.)

On August 25, 2002, plaintiff was admitted to the emergency room at the Ripley County Memorial Hospital complaining of swelling in both legs. Swelling was noted over the toes as well with possible bruising about the left ankle. (Tr. 282.) Plaintiff

reported having no pain. (Tr. 281.) Plaintiff's medications were noted to include Cholestyramine,[12] Atenolol, HCTZ, Triamterene (a diuretic), Enalapril,[13] Procardia XL,[14] and Hydralazine.[15] (Tr. 264.) A chest x-ray taken that same date showed evidence of COPD but no acute cardiopulmonary pathology. (Tr. 270.) A chest x-ray taken August 27, 2002, showed no acute process. The heart was normal in size. Dopplar study of the left leg was normal. (Tr. 271.) Plaintiff was diagnosed with uncontrolled diabetes, congestive heart failure with fluid retention secondary to medication, hypertension, and bronchitis. A sleep study was ordered to rule out sleep apnea. (Tr. 265.)

Plaintiff returned to the Family Clinic on September 4, 2002, for follow up. Plaintiff complained of nausea and of feeling bad. It was noted that a sleep study consult was scheduled. (Tr. 263.)

A sleep study performed on September 18, 2002, showed severe obstructive sleep apnea. It was recommended that plaintiff

---

[12]Cholestyramine is used to lower high cholesterol levels in the blood. Medline Plus (revised Aug. 13, 1998)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202137.html>.

[13]Enalapril is indicated for the treatment of hypertension. Physicians' Desk Reference 575-76 (55th ed. 2001).

[14]Procardia XL is indicated for the management of angina and for the treatment of hypertension. Physicians' Desk Reference 2512-13 (55th ed. 2001).

[15]Hydralazine is used to treat high blood pressure. Medline Plus (revised Apr. 1, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682246.html>.

use a CPAP machine on a trial basis and that a repeat study be performed. (Tr. 312.)

On September 20, 2002, plaintiff complained to the Family Clinic of a cough as well as head and chest congestion. Plaintiff was diagnosed with COPD, bronchitis, sleep apnea syndrome, and upper respiratory infection. Plaintiff was prescribed water pills, K-Tab, Atenolol, Neurontin,[16] Ceftin (an antibiotic), and Allegra. (Tr. 261, 263.)

On October 30, 2002, a repeat sleep study was performed with the use of a CPAP machine. The study confirmed an "excellent response" of plaintiff's obstructive sleep apnea to the machine, which was recommended be continued. (Tr. 302.)

Plaintiff was admitted to the Ripley County Memorial Hospital on September 25, 2003, complaining of increased blood pressure and intermittent chest pain for one to two months. (Tr. 326.) Plaintiff reported to Dr. Palani that he has some shortness of breath with the pain. (Tr. 322.) Plaintiff also complained of blurred vision (Tr. 325) but reported to Dr. Palani that he had no headache or visual disturbances (Tr. 322). Plaintiff reported experiencing no dysuria, no frequency and no hematuria. (Tr. 322.) Plaintiff was presently experiencing no chest pain but complained of discomfort in his middle back. Plaintiff's strong history of

---

[16]Neurontin is indicated for the control of some types of seizures in the treatment of epilepsy, as well as for the management of postherpetic neuralgia, i.e., pain after "shingles." Medline Plus (revised Oct. 3, 2003)<http://www.nlm.nih.gov/ medlineplus/druginfo/uspdi/202732.html>.

increased blood pressure and insulin-dependent diabetes was noted. (Tr. 326.)  Plaintiff's current medications were noted to include Enalapril, Neurontin, Hydralazine, Lasix, Procardia, Atenolol, potassium chloride, Dyazide,[17] Claritin, and eye drops. (Tr. 322.) An echocardiogram was essentially normal.  (Tr. 332.)  A chest x-ray showed no evidence of an acute cardiopulmonary process.  (Tr. 331.)  Plaintiff was diagnosed with chest pain and uncontrolled hypertension.  It was noted that plaintiff has poor compliance with his medications and has elevated blood pressure most of the time. (Tr. 319.)  Plaintiff was encouraged to take his medications as prescribed "as part of his problem was supposed to be due to not taking medications on a regular basis." (Tr. 323.)  Plaintiff was discharged on September 26, 2003, and was instructed to take aspirin daily and to take nitroglycerin as needed for chest pain. (Tr. 314.)  Plaintiff was also instructed to arrange for a stress cardiology evaluation at Barnes Hospital and to undergo a sleep study.  Upon discharge, plaintiff was diagnosed with uncontrolled hypertension, COPD, bronchitis, anxiety, sleep apnea syndrome, chest pain, and diabetes mellitus.  (Tr. 321.)

On October 3, 2003, plaintiff underwent MRI imaging in response to complaints of chest pain and pressure, and dyspnea on exertion.  No evidence of myocardial ischemia was found, but inferoapical myocardial infarct was noted.  (Tr. 315.)

---

[17]Dyazide is indicated for the treatment of hypertension. Physicians' Desk Reference 3085 (55th ed. 2001).

A sleep study performed April 1, 2004, showed excellent response of significant obstructive sleep apnea to plaintiff's use of a BiPAP machine, and it was recommended that plaintiff continue with BiPAP therapy. (Tr. 352.)

On April 14, 2004, plaintiff was admitted to the emergency room at Ripley County Memorial Hospital complaining that he was not able to decrease his blood sugar level while at home. Plaintiff denied any dietary indiscretion. (Tr. 351.) Plaintiff reported that he experiences polyuria and polydypsea but that he had no chest pain or lightheadedness. (Tr. 343, 351.) Plaintiff reported feeling weak. Plaintiff reported no tingling or numbness about the lower extremities. (Tr. 343.) Plaintiff was diagnosed with severe hyperglycemia and type-II diabetes and was admitted for control of glucose. (Tr. 344, 351.) Plaintiff was discharged on April 15, 2004, and was diagnosed with uncontrolled diabetes mellitus type-II, coronary artery disease, upper respiratory tract infection, anxiety, sleep apnea syndrome, and hyperlipidemia. (Tr. 342.) Plaintiff was instructed to undergo a diabetes evaluation and to increase his dosage of insulin. (Tr. 341.)

## IV.  The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since July 20, 2000, the alleged onset date of disability. The ALJ found plaintiff's conditions of congestive heart failure, coronary artery disease and high blood pressure to constitute severe impairments, but that such

impairments did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ also found plaintiff's allegations not to be credible. The ALJ found that since July 20, 2000, plaintiff has had the residual functional capacity to lift, carry, push, or pull twenty pounds occasionally and ten pounds frequently; to sit six hours in an eight-hour workday; and to stand or walk a total of six hours in an eight-hour workday. The ALJ found plaintiff unable to perform his past relevant work. (Tr. 16.) Considering plaintiff's age, education and ability to engage in work-related activities, the ALJ determined that Medical-Vocational Rule 202.17 of 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 2 supports a finding that plaintiff is able to perform work existing in significant numbers in the national economy. The ALJ therefore determined plaintiff not to be disabled and denied plaintiff's claims for benefits. (Tr. 17.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates

various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and specifically, that the ALJ erred in his credibility determination and failed to consider plaintiff's non-exertional impairment of chronic pain, thereby erring in his reliance on the Medical-Vocational Guidelines to find plaintiff not to be disabled rather than calling a vocational expert.

A. Credibility Determination

Plaintiff claims that the ALJ erred in his determination not to find plaintiff's allegations credible.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any

precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id. Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

In this cause, the ALJ identified the Polaski factors and set out numerous inconsistencies in the record to support his conclusion that plaintiff's complaints were not credible. Specifically, the ALJ noted plaintiff's complaints of diabetes-related symptoms to be inconsistent with the record which showed plaintiff not to have complained about or received treatment for any such symptoms. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (failure to seek medical assistance for alleged impairments contradicts subjective complaints of disabling conditions); see also McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993) (failure to seek treatment coupled with medical evidence which shows claimant not to have reported symptoms to physician

supports ALJ's adverse credibility determination). The ALJ further noted that plaintiff was able to work for years with his diabetic condition. A condition that was present but not disabling during working years and has not worsened cannot be used to prove a present disability. Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (per curiam); Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). The ALJ further noted that plaintiff's condition of sleep apnea responded excellently to the use of a CPAP machine and that the record showed potassium to control plaintiff's hypokalemia. See Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998) (impairment not disabling if controlled by medication and treatment); Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993) (same). The ALJ also noted that plaintiff's blood pressure condition was often noted to be uncontrolled, but that the record showed plaintiff's historic noncompliance with taking his blood pressure medication as prescribed. See Tellez, 403 F.3d at 957 (failure to take medications as prescribed supported adverse credibility determination). In addition, the ALJ noted that plaintiff complained that he experiences chest pain two or three times a day, but that plaintiff did not indicate that nitroglycerin failed to provide relief. The ALJ further noted cardiac studies not to show ischemia, abnormal ventricular function or coronary blockages. Evidence of mild impairments which do not significantly affect a claimant's relevant physical systems precludes a finding of disability. Qualls, 158 F.3d at 427. The ALJ further noted

that plaintiff testified that his doctor instructed him to exercise, and that such instruction was inconsistent with an implication that plaintiff's symptoms rendered him disabled. The ALJ also noted that plaintiff drew unemployment benefits upon cessation of his last employment in July 2000, and that plaintiff engaged in full time work from 1997 to 2000 subsequent to his filing for disability benefits in 1996. See Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994) (statement required for unemployment benefits that claimant is capable of working and seeking work is "clearly inconsistent" with claim of disability during same period). The ALJ also noted that plaintiff testified to smoking approximately thirty cigarettes per day despite his cardiac condition. See, e.g., McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (claims as to COPD not credible where, despite complaints of shortness of breath and doctor's directions to quit, claimant continued to smoke). Substantial evidence on the record as a whole supports the ALJ's findings as well as his determination that the inconsistencies in the record serve to discredit plaintiff's complaints of disabling symptoms.

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him and set out numerous inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a

whole.  <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990).
The ALJ's credibility determination is supported by substantial
evidence on the record as a whole, and thus the Court is bound by
the ALJ's determination.  <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841
(8th Cir. 1992).

B.    <u>Non-Exertional Impairments</u>

        Plaintiff claims that the ALJ erred in failing to
consider his non-exertional impairments and thus erred by relying
on the Medical-Vocational Guidelines in determining plaintiff not
to be disabled.    Plaintiff argues that the presence of non-
exertional impairments required the ALJ to solicit the testimony of
a vocational expert as to plaintiff's ability to engage in work-
related activities.

        The Commissioner's burden to show that there exist jobs
in the national economy that the claimant is capable of performing
may be met by reference to the Medical-Vocational Guidelines
(Guidelines) if the claimant suffers only from exertional
impairments.  <u>Bolton v. Bowen</u>, 814 F.2d 536, 537 n.3 (8th Cir.
1987).    Use of the Guidelines is also permissible where non-
exertional impairments exist but "do not diminish or significantly
limit the claimant's residual functional capacity to perform the
full range of Guideline-listed activities[.]"  <u>Ellis v. Barnhart</u>,
392 F.3d 988, 996 (8th Cir. 2005).    Where a non-exertional
impairment significantly diminishes the claimant's RFC, the
Guidelines are not controlling and the ALJ must call a vocational

expert or produce other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's abilities. Id.; Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). The Eighth Circuit has provided some guidance in applying this standard:

> In this context "significant" refers to whether the claimant's non-exertional impairment or impairments preclude the claimant from engaging in the full range of activities listed in the Guidelines under the demands of day-to-day life. Under this standard isolated occurrences will not preclude use of the Guidelines, however persistent non-exertional impairments which prevent the claimant from engaging in the full range of activities listed in the Guidelines will preclude the use of the Guidelines to direct a conclusion of disabled or not disabled. For example, an isolated headache or temporary disability will not preclude the use of the Guidelines whereas persistent migraine headaches may be sufficient to require more than the Guidelines to sustain the [Commissioner's] burden.

Thompson, 850 F.2d at 350.

The plaintiff here claims that the ALJ failed to consider his non-exertional impairment of chronic pain. It is well established that pain is a non-exertional impairment. Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). However, where an ALJ properly discredits a claimant's complaint of a non-exertional impairment, the use of the Guidelines is permissible. See Patrick v. Barnhart, 323 F.3d 592, 596 (8th Cir. 2003). Here, as set out above, the ALJ properly discredited plaintiff's subjective

- 26 -

complaints.  Further, an independent review of the record shows insubstantial support for plaintiff's claim that his impairments cause him to suffer from chronic pain.  Accordingly, inasmuch as the ALJ properly discredited plaintiff's complaints of such pain, he was not required to elicit testimony from a vocational expert regarding plaintiff's alleged pain and did not err in his use of the Guidelines.  <u>Id.</u>

Plaintiff does not assert in his brief or elsewhere that any other condition should have been considered by the ALJ as a non-exertional impairment.  The undersigned notes, however, that the record shows plaintiff to have experienced episodes of and received treatment for anxiety.  Such an impairment is a non-exertional impairment.  <u>Hunt v. Heckler</u>, 748 F.3d 478, 481 (8th Cir. 1984).  Nevertheless, the record further shows that such condition was intermittent in nature and was considered to be reactive to isolated occurrences in plaintiff's personal life.  It cannot be said, therefore, that such condition is "significant" to the degree that it can be considered a persistent non-exertional impairment which would prevent plaintiff from engaging in the full range of activities listed in the Guidelines.  <u>Thompson</u>, 850 F.2d at 350.  As such, the ALJ's use of the Guidelines was not precluded by plaintiff's isolated occurrences of anxiety.

In light of the above, the ALJ's use of the Guidelines to determine plaintiff not to be disabled was proper.  Because of the ALJ's proper decision to discount plaintiff's subjective

allegations of disabling pain, and given the isolated nature of his anxiety condition, it cannot be said that the ALJ erred in failing to elicit the testimony of a vocational expert.

Therefore, for all of the foregoing reasons, the Commissioner's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001); <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992). Accordingly, the decision of the Commissioner denying plaintiff's claims for benefits should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed and plaintiff's Complaint is hereby dismissed with prejudice.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this _1st_ day of March, 2006.